May it please the Court, I am Glenn Taubman representing Bernard McKay. I will attempt to reserve four minutes for rebuttal. Union membership is an enforceable contract between a union and an individual employee. For example, union members who violate this contract that they have with the union can be fined and sued in state court to enforce that contract. But like any other contract, there must be a voluntary meeting of the mind. Offer an acceptance before an employee can be said to have become a union member. A voluntary party to a contract of internal union membership. To quote one federal court of appeals, quote, Enlisting in a union is a wholly voluntary commitment. It is an option that may be freely undertaken or freely rejected. This court has consistently recognized the principle of voluntary union membership, going way back to cases like Hershey Foods and the Stanford case. And the Supreme Court of the United States in the Patternmakers case recognized it as well, holding that the policy of federal labor law is voluntary union membership. In this case today, the critical issue is whether Bernard McKay ever became a voluntary member of the AMFA union, and in so doing, waived his non-member right under Hudson, and this court's dean, and related cases for non-member agency fee payers. The district court correctly summarized the issue as, what is an employee's default setting? In other words, when AMFA won its certification election back in April of 1998, and it unilaterally issued a decree that all employees were union members, was Mr. McKay automatically a union member at that point? Or, was he still a non-member, who had to first take some affirmative steps to join AMFA, before he could be considered a union member, who thereby waived his Hudson rights, and at the same time, agreed to enroll in a contract of voluntary union membership? If he wasn't a member, why did he pay dues? He paid dues because he got a letter from the union saying, you owe us this money, and if you don't pay, you will be fired. The collective bargaining agreement, in this case, speaks nothing about agency fees, about paying less. It says, in order to work here at Alaska Airlines, you will be a member in good standing, which includes paying the dues. But isn't it also true that, even if he wasn't a member, the agency fee would be, he could pay the entire amount, unless he objected to paying the entire amount? That's correct. The fact of paying dues does not make anybody a union member. In fact, you could have situations, and we often do, of non-members who, for whatever reason, choose to pay the full dues, or make no choice whatsoever, and pay the full dues in order to keep their job. And that, again, does not make them a member of the union. You're not asking for summary judgment on this question, or at least you didn't get it, right? I was asking, in fact. So you didn't get it. So are you arguing that you should have gotten summary judgment, or you're just arguing that it isn't proper to give summary judgment to the union? Oh, I have argued, Your Honor, that the district court was wrong to grant them the union summary judgment, and given the totality of the record and the many, many undisputed facts that I feel like I've gone over ad nauseum about Mr. McKay never signing a membership form. But there are some facts in the other direction. Yes, there are facts. Especially if you believe that he was specifically told that he didn't have to be a member, and that he could resign his membership, and he never did. Well, I would say to those courts... It's a dispute, but it is said that he was given this document, and he didn't implement it. For purposes of this case and this brief, I have said I do not believe that that is a fact which precludes the proper granting of summary judgment. In other words, I would concede that, let's say he had these conversations. He was given this document, A, that still does not make him a member. I do not believe that the labor law of the United States, which requires voluntary unionism, allows one party to walk up to the other party and say, oh, by the way, you're a member, and I'm sitting here waiting for you to tell me how you're resigning. But since you haven't said anything, well, then, you're still a member.  Oh, he did only say one thing, that he could only have done if he was a member, and that was putting a ballot on the collective bargaining agreement. Yes, and I would be happy, and I will explain all of that. I think it's crystal clear in the record. It's clear from his declarations that are in the record, and none of this is contradictory. Mr. McKay did not go to a polling place to vote. He did not request that an absentee ballot be issued in his name. A union steward went to the union secretary, had an absentee ballot issued in Mr. McKay's name, came to Mr. McKay and said, I have been tasked with getting everyone to vote in this election. Mr. McKay wrote his name on the outside of the ballot, left the ballot blank, and did not actually cast a vote either way. But this is the critical point. It is admitted, and I would actually refer the Court to the Fidel and Lovis and Juraczynski depositions that are all in the record. It is admitted that AMFA gave Mr. McKay not an iota of information that this election was only open to union members, that by voting, you become a union member. This is all factually undisputed. I asked three union officials this, and I got the same answer. We gave no notices whatsoever that voting in this contract ratification makes you a union member. And I would submit to you that- This was brought up belatedly by the union and the district court, but this argument was not renewed in their briefs. Well, I understand. It came up. I just want to be clear that it was not specifically raised in their briefs. They did not cite a lot of LMRDA cases. Therefore, I did not respond to a lot of LMRDA cases. But I had the same discussion with the district court, and I would like to say what I told the district court, which is that, in theory, somebody could acquire union membership by a course of conduct. And I think that is what the LMRDA cases are going to. In other words, suppose for 20 years, I have been attending every union meeting, I have been voting in every election, and now I throw my hat into the ring to become president of the union. And the union says to me, Mr. Taubman, we do not have on file a membership card that you ever filled out. Therefore, you are not a member, and you have no membership rights. That is the kind of thing that the LMRDA was looking at. We do not have anything like that here. As I said to the district court, to the extent that membership in a union can be acquired by conduct, the conduct has to be a long-term holding yourself out as a union member. And I think we could all agree that the gentleman who announced that he is running for president of the local believes he is a union member. Suppose we were to conclude, based on the record that he was not a member, but that there was evidence suggesting that he had been notified of his rights as a nonmember. Where does that get us? That gets you to summary judgment in my favor, or in favor of my client, because we have in the record the notice, the Hudson policy, whatever you call it, that the union created and allegedly gave to Mr. McKay. And we do not dispute for purposes of these motions that this is what the policy is. The policy is facially inadequate, and I would specifically refer to your Honor's decision in the Cummings v. Connell case, among many others. The policy is facially inadequate. It contained no financial information whatsoever. It seemed to me to be probably facially inadequate as a policy, because what it said was we will do an audit every June, and we will give it to all nonmembers. So as a policy, as to what they were going to do if they did it, it would be an adequate policy. The problem here seems to be that for this particular year, they never actually did the audit. Does that phrase you for the problem there? Well, that's part of the problem, Your Honor. They gave him a policy which said you have this right to object. But, of course, this Court, among many others, has said that the policy must include financial disclosure. I said that they were going to give him the financial information. The problem is that for the particular year we're talking about, because they hadn't previously done an audit, they didn't. This is what I understand, correct me if I'm wrong. If they had done what the policy said they were going to do, i.e., produced an audit at a certain time and given it to all nonmembers and so on, it would have been a fine policy if the audit was okay and all that. But for the particular year, because it was the first year that they were the collective bargaining representative, they apparently hadn't done the audit for the previous year, so they were going to give an audit across the board, 10 percent decrease. And I gather not to produce an audit. I need to ask that to your opponent, because that was my understanding. I think that's not far off, Your Honor. The fact in the case is that after Mr. McKay was discharged, they had an audit available rather late, I would say. There are other flaws in the policy, on the face of the policy, and one that I think is important. The policy, in fact, says that you have to go through a final and binding internal arbitration procedure, and I asked the union executive director, Mr. McCormick, if that was actually enforced, and he said yes, we enforced the final and binding procedure. But the final and binding procedure is completely unlawful under the Supreme Court's Miller v. Alpha decision, as well as Dean. Mr. Taubman, did your client have an obligation to notify the union that he was electing nonmember status? Did he have any obligation to do that? Well, I think the answer is no, Your Honor, because that would presuppose that a person has an obligation to resign from an organization that he never joined. No, he could elect not to join and just tell them, look, I'm not a member of the union. I elect nonmember status. He never told them that, I guess. Well, that, I think, goes back to where we began. Under the labor law, it is my view, and I think this is very clear in the labor law, the default setting, as the district court said, the default setting is nonmembership. Employees have no obligation to go around and declare their nonmembership in an organization that they did not join. Excuse me, sir. It's your position that if it should turn out, whether there's a dispute effect or not, if it should eventually be resolved that your client was not a member of the union, then you say the obligation is upon the union, I think you're saying this, to provide all of the Hudson material regardless of whether the employee has requested it or not. Is that right? That is correct. That is absolutely correct. If he's a nonmember. If he's a nonmember. In fact, that's what Hudson says. The information must be given automatically to all potential objectors. That's the term that Hudson uses. They don't even speak in terms of members, nonmembers. Wasn't there testimony that he was, in fact, given the policy? Yes. Right. There's testimony of union officials, and I have said for purposes of these cross motions for some reason. Excuse me. Was Stephen LaVasse a union official? Yes. All of these people who were deposed had some officer-type role, or they all were officials of the union in one capacity or another, and I get confused as to who was the treasurer, who was the secretary, who was the communications officer, but every one of these people who testified on behalf of the union were union officials. I do want to save some time for rebuttal, and the court has not asked me anything about the exhaustion issue, which is really the only issue that AMCA seems to be raising, and the thing that I want to make clear on the exhaustion issue, which I'm not sure I made crystal clear in my briefs, is that there is no jurisdiction for a system board to hear any of these Hudson claims. It's just they do not have it. I don't believe as far as the Hudson claims that they have jurisdiction over either on the Hudson claims. In other words, what I'm suggesting is if Mr. McKay had gone completely through the system board, let's say he did and he got an adverse decision, I could have walked into federal court, filed the identical lawsuit that I filed, and that system board proceeding. The question is, can you go, and nobody addressed this in the briefs, can you bring a case against the union for a system board? You can't. That's what Clemens said. There's quotes from Clemens, from Fechtel-Cotter that specifically say... The case is against the employer and the union, but principally against the union. Correct. But if you look at Clemens, there is a wonderful quote in there which says, System boards do not exist. I'm aware of that. That's why I'm so mystified why nobody ever in the briefs discussed the question separately of whether you can bring a system board case against the union. And that's why I'm bringing it up now because I don't think I was supposed to. That's a slightly different point. You seem to be saying that you can't bring a Hudson claim against anybody. Not in a system board. I don't believe... That's an issue. Well, then either issue, I would say, I'm trying to be clear now, there is no way to bring these issues before a system board. Therefore, the alleged failure to exhaust is irrelevant. And I would like to reserve some time for rebuttal. Thank you, Mr. Chauvin. Thank you very much, Your Honors. Counsel? Good morning. Good morning, Your Honors. May it please the court. My name is Stanley Silverstone. I represent the Aircraft Mechanics Fraternal Association. And that union has been referred to as AMFA. With me at the council table is Aliki Ricklitus, also on behalf of AMFA. And the other gentleman, Mr. Van Cleave, represents Alaska. And I'd just like to note that I would like to reserve two, three minutes at the end          Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.  Thank you. I will pass the ballot and I will remove Mr. Van Cleave Mr. Van Cleave wants to add anything. Sure. AMFA submits that the district court was correct in concluding that it should not have jurisdiction over a dispute which the plaintiff voluntarily placed before the System Board. The law is clear. Explain to me how a case against a union was gotten before the System Board. I have gone over all the cases that you cited and either there was no union as a defendant or indeed there was a special provision that applied to this particular kind of a problem. So what is your authority for the proposition that the case against the union had to go through the System Board? Our position would be that this was not a case against the union. This was a grievance. But this is a case against the union. The current case is a case against the union. Correct. But our position is that the claim that the plaintiff is raising is a claim for a breach of the collective bargaining agreement. It was terminated under an article involving union security. It's a claim against the union and the employer. They claim it's not a case against the collective bargaining agreement. But whatever it is, it is against a defendant who could not have done it. Yes. I mean, the only type of claim that I know against a union would be a breach of the duty of fair representation. And that belongs here in court. Are you working on the RLA? I suppose. The RLA might be an RLA and allow cases in court to sue for violations of the RLA. Correct. So, if there were a statutory violation that were against the union, that would have to go to court. Right. So, what's the point of the exhaustion? What good is the exhaustion issue going to do? You may be able to get the union out, but so what? And the employer. The employer has probably gone out anyway. Right. But in this case, the grievance claim was, in his grievance, was only against the company. Right. So, how could he have exhausted the case against the union when he couldn't have brought the case against the union? Well, let me just mention the Alpha v. Miller case, because I think that's helpful. Because in Miller, they talk about how there is no obligation to exhaust for claims that are outside the collective bargaining agreement. Claims that, for example, in Miller, where they were brought by agency fee objectors who were challenging the calculation of the fee. But the Supreme Court there held that unless the objectors agreed to the procedure, there's no obligation to exhaust. But in this case, there was an agreement by Mr. McKay to submit his Hudson claim to the system board. And that's in his notice of appeal. Well, he did it. That's correct. He voluntarily submitted his Hudson claim. It's in his notice of appeal. But the employer, if the case was only against the employer, the employer's answer, presumably, in the grievance, would have been the same as it is here, which is the Hudson notice is not a hard problem. And they may well be right about that. So, what good is the exhaustion going to do? I don't really have any problem with this. Right. Well, our position is that because he submitted the issue to the system board, he had an obligation under STUMA to go ahead. But in STUMA, the union does not have to pay him. That's correct. But the principle of the case is that once you submit your grievance to the board, the board has exclusive jurisdiction over the issues that you submit to it. Well, I mean, this all leads us back to where the plaintiff begins, and that's the membership argument. If, in fact, there is no obligation to exhaust on the Hudson claim, then it leads back to the plaintiff's argument as to whether or not Mr. McKay was a member. And the first thing I want to note is that this is not a case, as the plaintiff, as the plaintiff has been characterized by the plaintiff, that ANSA unilaterally decreed and compelled everyone to become a member. And I need to cite the Pattermakers and the United Hanford cases to make that point. But those cases are not the facts that we have here. For example, in Pattermakers, there's a union rule that allows the union to find members who go on strike, sorry, who resign membership during a strike. And the court says, no, you can't restrict employee's rights to resign from a union. And Stanford case, again, it's similar. The union sued employees to compel them to become full-fledged members, and you can't do that. But those aren't the facts. In this case, there's nothing in the record that shows that Mr. McKay was compelled to be a member or that he was restricted in becoming a nonmember. In fact, it's exactly the opposite. Our evidence that he was a member, to start with, is you have to go back to when ANSA took over as the union. They were certified in April of 98. And when they replaced the previous union, the IM, they knew that under the IM, there No one had to be a member. No one had to pay dues. And they knew that there was very low participation under the IM. That's in Kevin McCormick's deposition testimony. There was only 21% of the employees paying dues to the union. So ANSA's goal in taking over the representation was to increase everyone's ability to participate. And so what they did was they offered membership rights to everyone right at the beginning so that everyone could participate in the union. And this is supported by documents that are in the record showing that there were at least three postings on bulletin boards of the local 14 in Seattle where ANSA notified everyone that they were being offered membership rights to be able to participate in their union, to be able to vote on contract ratification, vote for officers, attend meetings. And you'll find these in mostly in Kevin Jurczynski's deposition, Exhibit 6. There's a letter from the ANSA national director saying everyone can be a member. There's a notice a week later, also part of the same exhibit. Well, that's correct. I mean, I don't think that ANSA was saying everyone is a member. They were saying you are permitted to be a member so that you can participate. We do not interpret it as some kind of decree that was issued to all employees that now you have to be a member. No, it was you have now the opportunity to be a member so that you can participate in your union. Do you agree that the default is non-membership? In this case, I don't. I would say the default based on those notices that the ANSA put on its Folsom horse, the default in this case was that everyone is a member unless you tell us that you don't want to be a member. And I think I have to restrict that just to the facts of this case. I don't know if that would be the same answer in a different case. But the law is, notwithstanding these notices, that an individual could tell the union I don't wish to be a member and I wish to avail myself of my Hudson rights. Correct. That's correct. The law is I want an accounting and allocation of how the union spends its money. I'm happy to support its collective bargaining efforts because I think it benefits all employees, but beyond that, I'm just not interested. That's correct. An individual has a perfect right to do that. That's correct. And that is ANSA's view. Did the notices tell McKay that? The notices that were posted did not. However, there were people within ANSA and, again, officers, Steve Lovitz, who worked with Mr. McKay and Kevin Dristinsky, who was the local force and president. They knew that Mr. McKay was not a member of the previous union, the NIN, and they had an idea. Wasn't a substantial portion of the workforce under the prior union, non-union? That's correct. They were not members of their union. Does the record tell us about Hudson compliance with the prior union? Anything about that? No. I don't believe it does. Yeah. I would have to read it. It is fuzzy. You read a deposition and you can find different answers. It seems that they- It's an alternate question. It's an appropriate question. I would say this. I think- I mean, it's- He took out the evidence that he was given this information and given these documents at some point. And because after summary judgment and matter, we thought that his testimony was in conflict with that. Then, like, that might be a problem. It looks like you need that in order to succeed, and isn't that in enough dispute that it's a summary judgment problem? Well, I think it makes our case a little tougher, but I would- Take that out, honey. I think we would still win on Mr. McKay's deposition of testimony. And I'll point to- Something like this. I was vaguely told. Correct. His exact words were that he knew that there existed a vague mechanism by which a nonmember could tell the union that they wished to be an agency of state care. And that's his deposition. It's page 147 of our appellee's supplemental excerpts of record. Did he ever say why he did it? I think he did. I think his answer was he didn't see a need to because he didn't regard himself as a member. But, unfortunately, that didn't help ANFA to know whether he was a member or nonmember. And ANFA, the only way that they can know to give Hudson disclosures to nonmembers is to have a piece of paper from an employee saying, hey, I'm a nonmember. Did ANFA have a list of members, I'm afraid? At the beginning of their certification at Alaska, they did not immediately have a complete list, I believe. I think they were having trouble getting a complete list of all the names and addresses of the people on the bargaining unit. Certainly, if the record for that union representative said that they had given him notice of his Hudson rights, and he said absolutely did not happen, that issue would be inappropriate for summary judgment. I'm not saying that's what happened. I'm saying if that were the case, it would be inappropriate to grant summary judgment on that issue. Well, perhaps not. I would still submit that he still had an obligation to tell the union that he was choosing not to be a member. In a fact situation where in the prior union representation, he was in the workforce for a considerable period of time, he was not a member of the union, he was going along just fine. There's a certification election and a new group comes in and they put up a notice that says you've got to pay dues, but it doesn't say anything about Hudson rights. You still think it's appropriate to grant summary judgment, which would, in essence, put the burden on McKay to have exercises Hudson rights, namely notify the union, I don't wish to be a member, I'll pay the appropriate percentage of dues. Explain that. Well, I think it's an easier burden than the burden on the union to have to send, as the plaintiff's point is, that ANSA would have had to send Hudson disclosure to... Well, most unions have some idea who their members are. They do have a membership card. They have to know something about this. There is their membership card. There is some way of ascertaining who... Correct. I'd like to switch gears a little, though, and address the disclosure question. If he is a member, none of this matters, because he doesn't have Hudson rights and that's the end of it. But what about the disclosure issue if he's not a member, and particularly my question about what we got into before the union, is there any response to that? Well, if he's not a member, I mean, our position in our brief was that whether he's a member or not. Okay. What about the Hudson... If I'm right, is my understanding about the situation with the Hudson notice correct, i.e., that you have this policy, and if the policy does suggest that there's supposed to be an audit and that the audit is supposed to be given to all non-members, but after this year, particularly the first year, it didn't happen? Yeah. Actually, the 1999 audit was distributed in June-ish or July of 2000, because you have to do the audit after the year is over. So at the end of 1999, AMFA prepared its 1999 audit, and that was... The policy says it's a... Right, right. And that explains why, at the very beginning, AMFA's national administrator kind of felt that you had to just pick a number as to what was germane and what was non-germane. We picked 10 percent based on looking at other unions and what their germane and non-germane fees were. And then the audit was done in 2000, and that 10 percent would have been adjusted based on whatever the accountants found was the percentage based on the documents. But the problem is, probably for that one year, although for no other, he wasn't in a position to exercise such a right. No, had he told, in 1999, had he told AMFA that he was a non-member, he would have been entitled to the 10 percent reduction at that time. Yeah, that would have been satisfying, actually. I don't see why not. Because there was no list of financial... Oh, okay, you're right. There was no... There was no financial information. Right. But, in fact, the audit that was done for 1999 did have... There were challenges to that audit in 2000. I actually did the arbitration. I understand that. I mean, this whole set of laws is just little angels dancing in heads with pins, but this particular angel seems to require that you have the information at the time you object, and he didn't have it. The financial information audited or something like audited or verified or something, and he didn't have it. Is that true? It's true, assuming he was a non-member. He didn't get it, and I guess AMFA's only defense there is that we couldn't have audited. Well, of course you couldn't. Why couldn't you come back in 1998? Why couldn't you? There would have been no... AMFA was certified at a couple of airlines, but none had union security clauses. So what? You had an expenditure issue. You did something. That's true. I guess AMFA would have just taken the position that they, without any union shop provision, that there couldn't have been any Hudson rights that were involved. You're down to about a minute and a half. Did you want to offer Mr. Van Cleave an argument, if you wished? Sure. You have a minute and a half. Thank you, Your Honor. Thank you. Thank you for your argument, counsel. Thank you, Your Honor. Rick Van Cleave on behalf of Alaska Airlines. I want to speak briefly just because I think it's important to remind the court that I believe there's an independent ground to affirm the summary judgment in favor of Alaska against plaintiff, and that analysis is pretty straightforward. It starts with the basic proposition that union security provisions are legal under the Railway Labor Act, the National Labor Relations Act. This provision of this collective bargaining agreement was legal on its face. Alaska had agreed as a matter of contract that upon notification by the union that it would terminate employees for not complying with the union security provision. The question then arises, what is the employer's obligation when it receives such a request from the union? And in the McCauley case, which is an NORA case but applies directly here, the court said unless there was evidence that the employer was aware that the requested termination was for some reason other than failure to pay dues, the employer had no obligation to do any independent investigation and, in fact, had a contractual obligation to do what it said it would do and terminate. Which case? McCauley-Foundry v. NLRB. It's a Ninth Circuit decision, 553, Fed 2nd, 1198. But, obviously, it could have been. I know some cases which are very clear about the fact that there's no employer liability out of discharge are not so clear about the employer liability to notice that there is a discharge. The question becomes, I go back, Your Honor, and I submit to you that the question is, what's the employer's obligation as to when it receives a notice? And in this case, there was no evidence that Alaska knew. And, in fact, there's no evidence to date. I mean, Mr. Plaintiff has always said he was willing to pay it. I mean, there was no, this termination was solely for the reason that he failed to pay union dues. And whether it was an agency fee or, he didn't pay anything. At the time he was terminated, he was in arrears. He admits that he was in arrears. And there was nothing for Alaska to do other than comply with its contractual obligation. And it cannot be independently liable to the plaintiff for doing that when it didn't have any evidence stacked on it. Thank you. Thank you, Mr. Pantelius. Mr. Todman, the rebuttal. I would ask the Court to take a look at the deposition testimony of Ms. Neufeld, who was the Alaska HR manager, who testified, we knew that all of these people had been grandfathered into membership. We also did nothing, zero, to look at AMFA's Hudson policy to make sure that it was in any way adequate under the RLA or the Constitution. Absolutely. The case authority for that begins with Hudson, which says it is the responsibility of the unions and the government to provide these procedures. And in the RLA cases, this Court and Dean, among many other courts of appeals, have held that the employer stands in bested, the Railway Labor Act employer, stands in bested of the government employer in a public sector case. I ask the Court to take a look at the Dean case, Masiello, Lancaster, all cited in my brief, all of which held employers liable for the discharge which violated Hudson. I would also ask the Court to take a look at this Court's Foster case because that talks about adverse action that triggers employer responsibility and employer liability. And here we have industrial capital punishment, the ultimate adverse action. A few other very important points. I do believe this case is worthy of a summary judgment being granted. Of course, a summary judgment being granted in favor of Mr. McKay. I would concede, as I have done throughout the brief, that AMFA gave Mr. McKay the policy. Okay. The fact of the matter is because the policy is invalid because it didn't contain the disclosures and had the other flaws. It's not invalid as far as it relates to the current problem, which is it told him that he could be a nonmember. He was a nonmember. Excuse me. I don't mean to be dismissive. And if he was a nonmember, he would have certain rights. Now, as they played out in this particular circumstance, there may have been a lapse. But the policy on its face that he got as to how things would be handled was a perfectly valid policy. Or let's leave aside the arbitration for today. I don't know about that. But other than that, it was a perfectly valid policy. The policy says this applies to nonmembers, and nonmembers have certain rights. Okay. So, it did provide some information. But the law is clear that if the policy doesn't need Hudson in all of the particulars. I'm writing two things. One is, what is our general policy with respect to nonmembers and what their rights are going to be? And on that ground, just as a general statement, it was an okay policy. Then what they were supposed to do, however, is provide him with certain notices under that policy, and that didn't happen. That's a different problem. Well, I don't think it's a different problem, Your Honor, because these policies, I mean, they don't exist sort of in a vacuum. Well, it doesn't exist as a vacuum. Well, I don't believe he knew that in all of the particulars that the law requires. I think that's crystal clear. The Hudson notice is for the purpose of telling people who are nonmembers in a particular year what the circumstances are and that they can object. That's a different notice. This is more like what you would call a General Motors notice. Yes, I think in a sense that's correct. And we briefed some of these cases that have evolved into the NLRA. But one of the questions then becomes, well, what was Mr. McKay supposed to do with this policy? Let's assume that what Your Honor is saying is correct and that the policy is generally okay. Well, it's okay. What is he supposed to do with it? He doesn't want to be a member. But without having the financial disclosure, now you're asking a gentleman who is not a labor lawyer, who is not an accountant, who is not a college-educated, sophisticated person, who is a mechanic at the airline, is he supposed to start making judgments about how all of this is supposed to play out? It's not a chicken and egg situation. They have the obligation. Thank you substantially for your time. Taken by our questions, we thank you for your arguments. We thank all the sides for their arguments. The case just argued will be submitted for decision and will proceed to the last case on today's calendar, which is Providence Energy v. Roy Wallace-Bullington. Thank you. Thank you. It's always a pleasure to see counsel from Montana. And I should say your sister state of Idaho. You unfailingly demonstrate the lost art of collegiality and dealing with each other. You can disagree without being disagreed upon. From my part, I really appreciate it. Well, thank you very much. Counsel? Yes. My name is John Stevenson, and I represent the defendants, the appellants in this case, whom I refer to as the Bullington parties. We're seeking reversal of the district court's summary judgment against them. We've raised two principal arguments in our appeal. The first is a jurisdictional argument saying there was lack of diversity and thus no jurisdiction over the subject matter. Secondly, we're saying the judge committed error in granting the summary judgment that he used an improper standard for doing so and that he also abused his discretion in not allowing us to amend our answer. First on the jurisdictional argument, there's some dates that I think are important. They're in the brief, but I'll just run through them quickly. Providence Limited Liability Company, Montana Limited Liability Company, was formed in August of 1997. It had two members, Prism Corporation, which was based and incorporated in Oklahoma. The second member was Lone Star International Energy, incorporated in Nevada, but did all of its business in Weatherford, Texas. It was headquartered there. The Bullington parties made their investments in Providence and in the oil properties, which Providence was to acquire on December 16, 1997. Providence purchased the Montana oil properties on January 1, 1998. Lone Star took bankruptcy, went into a Chapter 11 bankruptcy, later became a Chapter 7. December 8, 1998, Lone Star's interest in Providence and in the oil field was sold in the bankruptcy court to Prism. March 30, 2001, on April 13, 2001, Providence and Prism filed this suit in Montana against our clients who were Texas residents. I guess the first question I have is, under Montana law, based on what you just recited, was Lone Star part of Providence when the Montana District Court suit was filed? We contend that it is. They contend that it was not, and that's the issue. Montana law specifically says that it's not Lone Star bankruptcy. Excuse me, Your Honor. Once they're declared a bankruptcy, isn't Montana law fairly loose, is that the question? Montana law says that upon bankruptcy, the member is dissociated. Right. And it uses the term ceases to be a member. Right. It does say that. So, they cease to be a member, so, therefore, there's Lone Star as the first party. We understand that position, but we disagree with it. And our contention is that the dissociated member still has a status for certain purposes. The dissociated member can bind the limited liability company in certain transactions to third parties. The dissociated member has a right to participate in winding up, can even initiate winding up a limited liability company. Whatever it's doing, it's not doing it as a member of the company. It can't be, because the statute just said it was one. It may have some role, but it's not as a member of the company. Our position is they cease to be a member for purposes of participating in the business affairs of the company and being active in the company. The statute says what it says. We don't disagree with that. What we're saying is that it retains a status that for purposes of diversity jurisdiction, they should still be considered a member for purposes of saying that they are a citizen of that state for purposes of diversity. That's our argument. Okay. They... And in doing that, we refer the court to the policy behind 28 U.S.C. 1332C, which is to prohibit corporations from invoking diversity jurisdiction without regard to states in which they conduct or have conducted their principal business activities. There are a series of cases, and granted they're not unanimous, which we cited in our briefs, other counselors cited them also, that state that a defunct corporation's principal place of business is in the state where it last conducted its principal business activity. Is that true of limited liability companies? We could find no cases on limited liability companies. Isn't the law that diversity for purposes of a limited liability company is determined by the citizenship of its members? Correct. And as of the bankruptcy, according to Montana law, Lone Star wasn't a member anymore, right? We say that it had... They were disassociated. They're called a dissociated member. The statute uses this term, dissociated member. The members still... We say a member, but a dissociated member. They have... They've lost most of their rights in the most, but not all of their rights in the limited liability. In any event, whichever side of this bench a person stands on, the focus is not where anybody did business. The focus is what disassociated under Montana law means. If it means what your opponents say it means, there is diversity. If it is what you say it means, there's not, right? I believe that's right, yes. And I think this is a matter of first impression. Why don't you move on to your next point? All right. Do you want me to move on to the summary judgment? Yes. Okay. I hear you. The district judge granted summary judgment against the Bulletin Parties based on admissions and their amended answer. The pleadings in this proceeding are not exactly straightforward, but... What basically happened to me was that the same provision that was in paragraph... The same allegations that were in paragraph 25 in the first amendment complaint had been in paragraph 23 in the earlier complaint, and had been denied earlier. That's right. But now were admitted, so it was just a score. That's right. Exactly right. What happened after that? I mean, it seems to me that the really interesting question is, What was the assuming litigation which either confirmed or disputed or otherwise dealt with what would otherwise be a judicial admission? In other words, there was some discovery, right? Excuse me? There was some discovery, was there not? There was no discovery in this case. I thought there were interrogatories, no? I think there was one... I guess there was one set of interrogatories, yes. That's true, it was, yes. There had been discovery in other proceedings, but not the Killian. But it seems to me that the interrogatories were asking questions that would have been inconsistent with paragraph 25, if they actually thought that was all admitted. What I'm trying to see is, was there prejudice to your opposing party by the fact that you made the submission? None at all. That's what I want to know. Right. Specifically. All right. The... All right, the sequence is this. The complaint was filed. The original answer was filed in November. May of 2002, six months later, plaintiff filed a motion for summary judgment. In that interim, there were some interrogatories. I can't remember when they were answered. But we were set to go to trial. It was very clear that the Bullington parties were resisting the plaintiff's claims. It was very clear that they denied the Providence Prison claims, that they had no interest in the oil field, none in Providence. What was it clear from? It was clear from the original answer. I submit it was clear from the amended answer, because they asked that no relief be granted. It was clear from oral arguments made in court. It was clear from status conferences we had with the judge where we were set to go to trial on August 13th. It was in the arguments that were made on the summary judgment hearing and later at a status conference before the judge ruled. It was clear that we opposed the Providence Prison position. And that was clear because we had filed a lawsuit in Texas, which was attached as an exhibit, where they were claiming fraud and claiming an interest in the oil field and in Providence itself. Those positions were asserted over and over and over again. Counsel for Providence Prison had no doubt what our position was. There was no... Had the judge granted the amendment, we would have proceeded to trial on August 13th, 2002. And it would have been a three- or four-day bench trial, and we wouldn't be here today. There was no discovery or anything else that was delayed or caused or... I can't make any prejudice to the party at all. Mr. Stevenson? Yes. One approach to this might be, I suppose, that you would say, well, okay, the admissions were made, but in determining whether or not the plaintiff is entitled to judgment, that's just one of the things that the court considers, part of the evidence, if you will, and the court still has to consider whether the plaintiff has really established its case. And maybe in connection with doing that, the defendants would be entitled to explain their admissions. Maybe they would say their lawyer was drunk and didn't say the right words, or maybe they used one of these machines where something would type out what you say, and the word said was deny, and the machine typed out admit. But there would be some way to explain the admissions, if not to negate them, at least to make a judge wonder whether they really were sufficient to establish the fact. Do you argue that you should be given an opportunity to argue that, even if the admissions stand? Or what is your... Suppose the admissions stand. What do you want then? What do you want to be able to argue to the court if we were to remand saying, well, the admissions stand, but that doesn't necessarily mean the plaintiffs are entitled to judgment. How would you proceed then in the face of these admissions? What would you do? Assuming the judge didn't grant judgment, I guess we would go to trial. I suppose they can use the answer on cross-examination and say, well, look at you. If I understand your question. Excuse me. I guess I have another way of saying the same thing. This was a summary judgment motion. Yes. They came in and they said you made a judicial admission. Did you put in any evidence to a summary judgment kind, declarations, depositions, anything, to support your version of the case? They had something. They had a court admission. What did you have? I put it in context. The main issue, the judge was wondering whether prior bankruptcy proceedings, whether certain findings made by the bankruptcy judge created a collateral estoppel issue. In a tiny part of the argument made by Mr. Johnson, the opponent's counsel, he mentioned the admissions in the answer. It was almost as if it was an afterthought. The focus of the argument was on the collateral estoppel. Of course, during that time, the position that was advocated by co-counsel Mr. Sorenson was, just as I'm saying, that they do, that the Wellington parties had fraud claims against Provident Prison, that they were claiming an interest in the field. You put in the evidence to support your fraud claim. Did you do that? It was not an evidentiary hearing. There was no evidence presented either way. In a summary judgment matter. Somebody filed a summary judgment, said I'm entitled to summary judgment. You come back and you say declarations that support your position. Did you do that? What we had done, or what was done, was there was an affidavit submitted by co-counsel Mr. Sorenson on June 4th before the hearing. And it's in the excerpts of record 195. And this was in connection with the motion to amend our answer. But that's not evidence. That was your measurement measure answer. But did you put in any evidence? Did you put in any declarations, depositions, documents, or anything that would support your position on a motion for summary judgment? Anything? We did not introduce any evidence at the hearing. Why didn't you just lose for that reason? Why are we getting into anything else? Pardon me? Why don't you just lose for that reason? I mean, there was a submission, right? Right. Right or wrong or whatever it was. Right, right. So they had something. They had the submission. You had nothing. So why is nothing there? Well, we have the record that was before the court. That's what I'm asking. What was in the record? All right. What was in the record was a plaintiff's complaint, a defendant's answer, which attached the proceedings from Texas. The Billington party said two days before this suit was filed, or three days before, had sued Provident Prism in Texas claiming damages and claiming all of their rights in and to the field. It had affidavits attached to it. It had documents attached to it. During the ‑‑ which supported the claims of the Billington parties. So you submitted ‑‑ And ‑‑ Let me see if I can understand this. You submitted pleadings from the other case, including affidavits and declarations, into this record? Yes. We also had filed briefs. The judge had asked us to focus on the collateral estoppel issue. So that's what we were focusing on. I prepared a brief on that, and I submitted exhibits, and I set forth in detail, well, I set forth an outline of our claims, and I submitted the evidence on which we intended to support our claims for relief. Or, to put it conversely, for our defense against the Provident Prism claim in Montana, which was primarily the quiet title and seeking a declaration that the Billington parties had no interest in the oil field and no interest in Provident. And that material is in ‑‑ And that was in the record before the judge at the time ‑‑ The excerpts? That material is in the excerpts of record now? The collateral estoppel brief? With the declaration? Was that from the state court in Texas? Yes. The complaint? It's in the excerpts of record in this case. Right. Rather than look for it and eat up your time, why don't you tell us that on rebuttal? You've got about two minutes left, and you may want to respond to your opponents. Right. You can give us post-citations when you come back up. All right. I will. Thanks so much for your time. Thank you. Mr. Johnson? Thank you, Your Honor. I may please the Court. My name is Steve Johnson. I represent Provident Prism, the appellees and plaintiffs in this case, along with my partner, Thorne Hart. And we'd like to split the arguments with the Court's indulgence. I'd like to address the summary judgment issues or, excuse me, the jurisdictional issues, and Ms. Hart will address the summary judgment and amendment issues. Of course, we'll both respond to any questions the Court may have. In the case of summary judgment, this was a declaratory judgment action filed by the plaintiffs, appellees in the District Court in Montana. It was premised on diversity jurisdiction. And under the diversity statute, we don't get to the question of citizenship if we don't get past membership. There are two plaintiffs, as the Court knows, Prism Corporation indisputably a citizen of the state of Texas, both by place of business and by state of incorporation. Provident is the Montana LLC going under the Montana law. At the time of the filing of the suit below, there was indisputably, on the record, one member of Provident. That was Prism Corporation, the Oklahoma citizen. Lone Star historically had been a member of Provident, but at the time of the filing of the suit on April 11, 2001, was no longer a member, not only because of disassociation by its filing of its bankruptcy, but more conclusively even than any sort of interpretation of the Montana LLC statutes would require, by a conveyance by the Lone Star bankruptcy trustee of all right, title, and interest in Provident to Prism Corporation, which then became the sole remaining member of the LLC Provident. I think we're pretty clear on that point. Okay. We may be ready for Ms. Hart on the other issue. Yes, Your Honor. If I can respond. There was some discovery done in this case in responding to the Court's previous questions. There was a set of interrogatories not in the record on appeal. There were production requests, and there were the requests for admissions that are in the record have been included in the supplemental record. Now, the summary judgment was eventually granted based on this judicial admission. You had really been influenced by the judicial admission. Presumably, you wouldn't have taken any of this discovery because there's no case. I mean, that judicial admission is the case. That's absolutely correct. Why are you asking all these questions? You must have not thought it was. You knew they didn't mean it. I mean, you knew they couldn't have meant that. It would have been a case. I asked questions upon other matters in the record and matters to bolster up what was the another grounds, the collateral estoppel grounds that was also briefed in the summary judgment motion from the bankruptcy court attempted to get admissions along those lines. I was mystified by the admissions to central allegations, but I didn't know what the strategy of the opposing side was. I frankly felt that they were admitting things because that was the effect, as I saw them, of the bankruptcy court's adjudication on the same issues, that is effectively mutual agreements signed by Lone Star and by the Boeington parties that the bankruptcy court had ruled. My clients had not signed. This was just silly. Obviously, they just screwed up the transposition of paragraphs and wanted to hold them to it. That frankly didn't cross my mind, Your Honor. I really had no intention of lying in wait. I didn't know the strategy. I expected that I'd find out something other than I found out when I filed a motion for summary judgment, and then I found out that their only position was that they'd made a mistake. I didn't know that before. Why don't we move to summary judgment? Pardon me? Why don't we move to summary judgment? When do I move for summary judgment? I believe— Why don't we move— Oh, yes. Yes, Your Honor. Thank you. Thank you very much. Ms. Hart? Good morning, Your Honor. My name is Karen Hart representing Providence Prisons, and as Co-Counsel Steve Johnson indicated, I will be discussing the issues of summary judgment and amendments. The issues are courts-related, as has already been discussed, because the summary judgment order was based on admissions in the amended answer, which the Billington parties then sought to amend through two separate motions to amend that were denied. And that was in extent, as Judge Berzon pointed out, the sole attempt to overcome this motion for summary judgment. As Judge Berzon— What about that? Not to say that the judicial admissions were there, but it's not just part of it. What else did you have attached to the summary judgment motion? What else did they have attached to the summary judgment motion to establish that? The motion for summary judgment in this instance were based on the collateral estoppel issue and then the admissions in this case to, frankly, potential allegations of the request for declaratory judgment. There was no additional factual evidence regarding the matters that were admitted. Basically, you were saying this has been thought out in bankruptcy court, and we won. Correct. Correct, Your Honor. And the motion for declaratory— To tell the Montana world that they have no interest in this. Correct. Correct. And so also, of course, the bankruptcy court orders where findings of facts had been made along the same lines as these admissions were submitted, but in terms of additional separate evidence. Your Honor, you didn't attach your summary judgment motion to any additional factual information, nor did it need to be defended. Is that right? Correct. Correct. Please. May I address that question? The only information attached to the summary judgment motion were the records from the bankruptcy court, the involuntary case, and the summary judgment matters. We asked for the district court to take judicial notice of several bankruptcy court orders, of depositions of key fill-ups, of other depositions of some of the Bulletin Parties. That's correct. And your defendant, your opponent also, in the same form, attached to— Yes. In fact, early on in October of 2001, before the initial hearings on the pretrial motions for change of venue and for dismissal for subject matter jurisdiction filed by the Bulletin Parties, we filed that motion. It was in the record, a motion for leave of the district court to take judicial notice for leave to file bankruptcy court pleadings, depositions, orders of the bankruptcy court dismissing the involuntary case, and the order of the bankruptcy court granting summary judgment in the adversary proceeding. Those were all in the record. We referred to those in our briefing of the summary judgment issues. I believe we also filed the interrogatory requests for admission and production requests, though, that are not in the record with the district court in support of the summary judgment. Though, as I stand here, I can't recall correctly, but I believe they were also included in the record in summary judgment. Your Honor. Thank you. And currently, as in response to Judge Berzon's question, they have pointed only to the Texas complaint, which I wanted to clarify was attached to their original answer. That's the form in which it appears in this record. It's attached to the original answer, which is, it is our opinion, is superseded by the amended pleading, and it should not be considered under this circuit's holding in cases such as King v. Lafayette. But the Ninth Circuit has clearly held that once an amended pleading is filed, it supersedes the original pleading for all purposes. What amended pleading are you talking about? There was an original answer that was, and there are different titles. First original answer, I believe, was the first one that was filed. And that was, and then they filed an amended, and that was the answer that had the Texas complaint attached to it. Then they filed an amended answer on November 15, 2001, that did not include a Texas complaint and that included these admissions. And the motion for summary judgment was directed toward that amended answer. And it is our position that the original pleading, which the Bulington parties have asked that this court consider in making a summary judgment determination, or have argued that the district court should have considered in making a summary judgment determination, were properly disregarded by the district court because that pleading and all attachments to it had been superseded by the amended pleading, the amended answer, which was in effect at the time the motion for summary judgment was made. And then it- Do you have your point of treasure, if at all, At the time, certainly we were entitled to rely upon the admissions that were made. At the time, they claimed to have caught the mistake, the error. It was after a motion for summary judgment had been filed, months after discovery had closed- Was there any discovery that would have gone in this case, given the fact that there had been discovery and all the other things, and that you had the interlocutories and you had the admissions? I was not controlling that personal litigation. So, again, I would assert- This case has been litigated to death. That's certainly our opinion, as it was in the collateral assault motion. Well, if those particular issues had been denied, I think we certainly- and they were allowed to change it at that stage in litigation- I think we certainly would be entitled to pursue any discovery that we felt- I said it's a practical matter. You'd already discovered the whole thing in several different times and several different places, I guess. Was there any additional discovery, as a practical matter? The additional discovery were the SI license pass data, the interlocutories in this case, request for admissions, and production requests. There were no additional depositions. I disclosed each of those people. Given the cost of this case, was there any basis that you didn't actually legislate? Yes, Your Honor. We didn't know the basis for any claim for constructive trust, any facts, other than what was in the bankruptcy court record. The prejudice would have been we'd have to take a round of depositions of each of the bulletin parties to make sure that, other than the mutual agreement, that had been the issue of litigation in the bankruptcy court several times, in the involuntary and in the adversary proceedings, whether the other than mutual agreement signed by Lone Star and the bulletin parties, there was any other factual basis for imposition of a constructive trust that was part of the paragraph 25 that was admitted in the first minute of the complaint and part of the admissions upon which the district court granted summary judgment. It's fairly striking that in the argument of summary judgment, the expression of the admission got very short-churned. It's really hard to believe anybody was willing to do this. Actually, this litigation has gone on for a long period of time. My client cannot afford to a much more litigation, and that was the reason we relied on those admissions. They were very specific admissions, and to shorten up the discovery process, the motion to amend had been granted, and then we would have had to have requested a continuity to the trial reason, and the discovery was that it meant more postponement, more litigation around the depositions of each of the bulletin parties, and consequently, more prejudice for my client in getting this resolved. Is that something that's typically in the case law recognized as prejudice? That, Your Honor, I haven't specifically researched. I'm sorry. Okay. I'm sorry about that. I didn't do the – I wasn't involved in the factual preparation of the case below. Could you repeat the question in terms of the case law that you just asked? I just wondered if, in the case law, the prejudice your co-counsel described is recognized as, for lack of a better expression, authentic prejudice. In other words, is it an element of prejudice that you have to prove up what the other side has already admitted? And I believe the answer to that is no. I could do that. Well, certainly the elements of prejudice that they usually look to under Rule 15- I mean, prejudice is a witness's death. The document is not available. Well, there is case law certainly holding in the context of Rule 15a that there's prejudice to the opposing party if discovery would have to be reopened, if there would have to be a continuance of the trial date, and those are cited in our response brief. And additionally, prejudice under Rule 16b, which under Johnson v. Mammoth Recreation, Inc., is only a secondary inquiry, and Johnson really stands for three propositions, the first of which is that if a motion to amend is made following a scheduling order deadline, Rule 16b applies, and Rule 15a only applies if a party can overcome the hurdle of Rule 16b. And the second proposition that Johnson stands for is that if a motion to amend following a scheduling order deadline to amend is made without an accompanying request to modify the scheduling order, that that motion is untimely and can be denied solely on those grounds. Now, that occurred in the Johnson court. It also occurred here. And the Johnson court went on to say, okay, even if we consider this to be a de facto motion to modify, which would have to be done in this case to get past the untimeliness requirement, even if we consider it a de facto motion to modify a scheduling order, then they sought to overcome a standard of good cause. And good cause focuses on prejudice to the opposing party only secondarily. And first — How about trying cases on their merits? Well, that's really the liberal amendment policy of Rule 15a, which the Johnson court insists is overcome by 16b and is referred to only secondarily in cases where the scheduling order has — where the time for that action has passed according to the scheduling order. What's your summary judgment motion without the admission? The collateral estoppel issue, Your Honor. There's still an independent collateral — I think that these two sides having the same interest in another forum tried and litigated these very issues. They're over and done with. Correct. They shouldn't get a second bite at the end. Correct, Your Honor. And then, additionally, that Judge Padden should be affirmed. And if I could just continue briefly on the Rule 15b standard of good cause. I think we — When you think about this, the Rule 15b standard, the Rule 15a question, all goes to whether or not they could amend it for the purpose of impeachment. Right? And they could not. And the admission is there. Still, as I understand the case law, and as my other colleagues have indicated as well, it could be explained, it could be overcome with other evidence. It isn't necessarily the end of the story. And actually is what I think it is. And this didn't — because in this case, there wasn't any additional evidence produced. They really refer solely to the original complaint or then argue, on the other hand, that the motion to amend should have been granted. They do, in a somewhat vague way, say that their amended answer would have been sufficient, and they refer to kind of broad plans. But, of course, the Rule in the summary — The answer, if adequate, isn't sufficient for anything in the summary judgment anyway. Correct. And that was the point that I was just going to make. So, the union's mandating evidence behind it. Well, we put in undisputed evidence of admission. Here it is. Correct, which we're entitled to rely upon, certainly. But it shouldn't be our place to have to second-guess an admission or to conduct discovery on admission. That's the purpose of narrowing the issue. Didn't you have the representation that they put in proceedings from the bankruptcy court, including whatever evidence was submitted in the summary judgment? That they put in the — actually, that they put in evidence from the Texas proceedings? That was attached only to their original answer that had been superseded by the amended answer. Summary judgment. If it was, it was only to the extent that it was submitted with the answer. That's the only form that it occurred in the record, was attached to an answer. And I believe they just referred to it. But it's not in this record, and so I'd want to be careful about the representations I was making there. But certainly in this record — What do you mean by this record? The record for this court. Why isn't it? If they had submitted with their response summary judgment motion, even their prior complaints and attachments there, too. And the recollection below is that my recollection of what occurred below was they simply said, oops, sorry, we want to amend. And that there wasn't any evidence submitted attached to a summary judgment motion. Opposing counsel has referred in general to the court should have looked at the entire record and essentially made up facts for us that would have disputed summary judgment, because everybody should have known. However, the only thing that they can really point to at this instant is the Texas complaint that was attached to the original answer, which, as I said, had been superseded. And, of course, the motion to amend, to briefly return again to that issue, the 16B diligence standard. In Johnson, the final thing that the Johnson court held was that in determining under 16B whether good cause has been satisfied, one looks only to whether the other party has been diligent.  And then if they can't show diligence, they only look to prejudice to the opposing party secondarily. If there's no showing of diligence, the inquiry should end there. And the Johnson court was very emphatic there of really protecting the district court's ability to control its docket and to not reward the indolent and cavalier was, I believe, the quote of the Johnson court. There's a difference between making a mistake and being indolent. We understand your argument. Thank you both very much. Rebuttal argument? We've got about two minutes. The record before the court included the Texas complaint attached to the Texas. The record before the court isn't good enough. We have case law that says on summary judgment you have to bring the information to the court on the summary judgment papers and not expect the court to read the whole record. So the question was specifically pointed out to the judge in the summary judgment papers. In the summary – when we resisted the summary judgment papers, we were briefing the issue of collateral estoppel. And in that we set forth our claim and I attached exhibits to the brief that were directed toward the summary judgment. And we were saying that these are genuine issues of fact for the court to consider. So you did attach some of these documents, evidentiary documents. To the collateral estoppel brief. And I didn't attach the full brief in the excerpt of record. I included several of the exhibits which are in the – But they're in the record and we can go look at the record. Excuse me? They are in the record. Yes, they are. They are in the record. The judge knew what our position was. Steve Johnson knew what our position was. We were going to trial. At no time was there any mention of taking depositions. It would be pretty cavalier for somebody to wait for the close of discovery and file a summary judgment motion. And then say, oh, I've got to go – now I've got to go take depositions. A person doesn't know ahead of time what a court's going to do with a motion for summary judgment. If he intended to take depositions, he should have said that before the close of discovery. There was no mention of doing that. We had conferences with the judge. We were headed to trial. We're going to bring our witnesses up from Texas and present a short trial. I'll just conclude unless you have more questions by citing the standard. Ninth Circuit test summary judgment is not appropriate where the record, including documents and pleadings, establishes facts which give rise to contradictory inferences, one of which supports the party opposing the motion. If you look at all the papers, clearly there are inferences that give support to the party, the Bullion party, to oppose the motion. And we submit under that standard, Judge Haddon, it should be reversed. Thank you. Thanks for your argument, counsel. Thank both sides. The case gets argued. It will be submitted for decision, and the court will stand in recess for the day.
judges: Thompson, Hawkins, Berzon